IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

TYLER HOLTE,

                Plaintiff,

v.                                                                                      OPINION and ORDER

CITY OF EAU CLAIRE and                                          20-cv-131-jdp
HUNTER BRAATZ,

                Defendants.

---

Plaintiff Tyler Holte was shot by defendant Hunter Braatz, an officer in the Eau Claire Police Department who was attempting to arrest Holte under a felony warrant. Holte brings a claim against Braatz under the Fourth Amendment to the United States Constitution, and he brings a state-law claim against the City of Eau Claire, Braatz's employer, as the party responsible for paying any judgment against Braatz. Dkt. 1.

Defendants move for summary judgment, contending that Braatz is entitled to qualified immunity. Dkt. 9. The court will deny the motion. A reasonable jury could find that Holte was only passively resisting when Braatz shot him, and clearly established law prohibits the use of deadly force against a passively resisting suspect. Holte's claim against Braatz will have to be decided by a jury, but Holte likely does not have a viable separate claim against the city.

Defendants also ask the court to try the case in Eau Claire. Dkt. 36. The court will deny that motion.

UNDISPUTED FACTS

The following facts are undisputed except where noted. The court will discuss additional facts as they become relevant to the analysis.

On April 1, 2015, the Eau Claire emergency dispatch service placed a service call to the Eau Claire Police Department regarding plaintiff Tyler Holte. Holte's probation officer had issued a felony warrant for his arrest (because Holte had missed an appointment with her, although that wasn't known to any of the officers involved). The dispatch service informed the police department (through notes on a computer system) that Holte was at a local auto repair shop and said that he was "on the run and says he will make officer shoot him to catch him." Dkt. 12-1. The dispatch service also said that it was unknown if Holte was armed and instructed officers to "use caution at this time." *Id.*

After the service call, officer Nathaniel Ollmann reported over police radio that Holte had a history of firearm possession. Sergeant Travis Quella then asked other officers to meet him near the auto repair shop to plan Holte's arrest. Braatz heard both transmissions and drove to meet Quella and several other officers.

After Braatz arrived, Ollmann told the gathered officers that he had spoken with Holte's mother, Annette Mott. The parties dispute what Mott actually said to Ollmann, but as shown in a video recording from Ollmann's squad car, Ollmann told the officers that Mott had reported that Holte had a weapon and was going to make the police shoot him.

Two officers drove an unmarked car to near the auto repair shop. They saw Holte in the driver's seat of a car, talking to a distressed woman (later identified as Mott) who was standing on the driver's side of the car, reaching into the driver's window. Other officers approached in their squad cars. Holte drove away quickly, causing Mott to fall to the ground.

Some of the officers began to pursue Holte, but he refused to stop. Holte drove at speeds up to 40 miles per hour above the speed limit and ignored multiple traffic signs as he tried to

evade arrest. Quella decided that the officers should conduct a slow search for Holte's vehicle instead of pursuing Holte at high speed through the city.

Holte pulled into the parking lot of a VFW tavern in a residential area near the Dells Pond, a small lake on the Chippewa River. The VFW building stood at the top of a steep, wooded embankment. A guardrail separated the back of the building from the embankment. Holte got out of the car and fled on foot down the embankment before any officers arrived.

An officer located the car in the VFW parking lot and called for backup over the radio. The officers didn't know whether Holte was still in the car, so they established an inner perimeter around the car and an outer perimeter around the nearby residential neighborhoods. When Braatz arrived, he walked to the guardrail to look down the embankment. He saw that the embankment was wooded with heavy foliage. A set of stairs descended from the parking lot to the lake.

Ollmann arrived and joined Braatz, and they walked down the stairs to the shore. Braatz then saw a white man uphill, moving quickly through the trees. The man was Holte, but Braatz was unsure about the man's identity at the time. Braatz radioed the officers in the parking lot to ask whether Holte was still in the car; they still didn't know.

Braatz and Ollmann continued walking up the embankment until they reached a clearing. They saw Holte about 40 feet away, uphill from their position. Holte was resting on a stump or a tree root. Other officers positioned at the guardrail above the embankment also saw Holte, who appeared to be either sitting down or leaning against the embankment. Several officers, including Braatz, aimed their firearms at Holte. The officers repeatedly ordered Holte to show his hands. (As discussed in the analysis section, the parties dispute whether Holte's hands were visible to Braatz and whether Braatz warned that he would shoot if Holte did not

raise his hands.) Holte heard the commands but did not move. Braatz fired his rifle twice, striking Holte in the leg and shoulder. Holte slid about 20 to 30 feet downhill, where the officers went to him to administer aid. The officers discovered that Holte was unarmed.

ANALYSIS

A. Holte's claim against the City of Eau Claire

Holte says in his complaint that the City of Eau Claire is liable for Braatz's actions because Braatz was acting within the scope of his employment when he shot Holte. Dkt. 1, ¶ 502. Defendants agree that Braatz was acting within the scope of his employment when he shot Holte. Dkt. 5, ¶ 304.

Holte doesn't allege any wrongdoing by the city or allege that Braatz acted under a city custom or policy. Instead, Holte relies on Wis. Stat. § 895.46 for this claim. That statute requires the state and its political subdivisions to pay judgments entered against their employees for acts committed while carrying out their duties if "the jury or the court finds that the [employee] was acting within the scope of employment." Wis. Stat. § 895.46(1)(a).

Section 895.46 does not create a private right of action against a municipality—at least, not for a civil-rights plaintiff like Holte.[1] As Judge Pepper stated in *Williams v. Michalsen*, a racial-profiling case in which the plaintiffs had named the County of Waukesha as a defendant under § 895.46,

---

[1] If the city refused to indemnify Braatz against a judgment that Holte obtained against him, Braatz—not Holte—might have a cause of action against the city under § 895.46. *See Cameron v. City of Milwaukee*, 102 Wis. 2d 448, 307 N.W.2d 164 (1983) (city police officers brought suit under § 895.46 against their employer, which had refused to indemnify the officers in a civil-rights action brought in federal court).

4

> The question is whether the county is a proper defendant when the plaintiffs have not alleged any wrongdoing on behalf of the county. It is not. If the individual officers are found liable, the indemnity mandated by § 895.46 will be triggered; the plaintiffs do not need to sue the county for that to happen.

No. 19-cv-56-pp, 2020 WL 1939136, at *9 (E.D. Wis. Apr. 21, 2020).

The parties did not address this issue. The court will give Holte the opportunity to show cause why the city is not entitled to summary judgment on his § 895.46 claim.

## B. Holte's claim against Braatz

Holte contends that Braatz violated his Fourth Amendment rights by shooting him. Defendants contend that they are entitled to summary judgment on this claim on two grounds: (1) the undisputed facts show that Braatz didn't violate Holte's Fourth Amendment rights; and (2) Braatz is entitled to qualified immunity for his actions because it wasn't clearly established at the time that shooting Holte under these circumstances would violate his rights. On defendants' motion for summary judgment, the court must resolve all factual disputes and draw all reasonable inferences in Holte's favor. *Blow v. Bijora, Inc.*, 855 F.3d 793, 797 (7th Cir. 2017).

### 1. Violation of Holte's rights

A police officer's use of force during an arrest is judged under the Fourth Amendment's reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 395 (1989). The court must consider the officer's use of force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. The court must consider the officer's actions under the particular facts of the case, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* Whether an officer's use of

force is objectively reasonable is a legal determination if no material facts are in dispute. *Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 520 (7th Cir. 2012).

As for the first factor, the severity of the crime at issue, Braatz knew only that Holte was wanted under a felony warrant. Braatz did not know the nature of the felony, and he had no reason to believe that it was a violent felony. But Holte had committed a further "serious crime" after he saw the officers at the auto repair shop: a "reckless flight from the police in a vehicle." *Johnson v. Scott*, 576 F.3d 658, 660 (7th Cir. 2009). So the officers were pursuing Holte after he committed a serious crime, even though they did not know what crime prompted the warrant in the first place.

The second factor—critical in this case—concerns whether Holte posed an immediate threat to officer safety or public safety. Defendants cite several facts known to Braatz that support the conclusion that Holte posed a *general* threat: he may have been under the influence of drugs, he was believed to have had a weapon, he intended to force the police to shoot him, he had driven dangerously to evade arrest, and he was near a tavern in a residential area. But *Graham* instructs the court to ask whether Holte posed an *immediate* threat, not a general threat. Even if Braatz might justifiably have used deadly force earlier in the pursuit, "he [did] not retain the right to shoot at any time thereafter with impunity." *Ellis v. Wynalda*, 999 F.2d 243, 247 (7th Cir. 1993). "Force is reasonable only when exercised in proportion to the threat posed, and as the threat changes, so too should the degree of force." *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 863 (7th Cir. 2010) (citations omitted).

This factor turns on a key factual dispute, which is where Holte's hands were just before the shooting and whether they were visible to Braatz. Braatz testified in his deposition that he was unable to see Holte's hands clearly, that Holte's right hand was "hidden in his sweatshirt

6

like he's holding something," and that he couldn't tell whether Holte had a weapon. Dkt. 17-1 (Braatz Dep. 90:11–15). But Holte testified in his deposition that his hands were on his knees or on top of his thighs at this time. Dkt. 16-1 (Holte Dep. 134:14–135:9).

Defendants concede that the position of Holte's hands is disputed, but nevertheless they contend that Braatz's testimony that *he* could not see Holte's hands is undisputed. They cite Holte's deposition testimony, in which he agreed that it was possible that "the police officers" could not see his hands because of where his hands were placed on his thighs and his position on the embankment. *Id.* at 136:22–137:11. But Holte merely acknowledged that it was possible that *some* of the officers might not have been able to see his hands; he didn't testify that his hands were hidden from any specific officer's view. And defendants' argument misses the more fundamental factual dispute. Braatz testified that he was unable to see Holte's hands because Holte's right hand "was tucked underneath his sweatshirt" and because Holte's left hand was hidden from view until he moved it while shifting his position. Dkt. 17-1 (Braatz Dep. 91:15, 92:4–9). In contrast, Holte testified that he "felt like he was frozen," that he kept his hands on his thighs throughout the confrontation, and that he "was just trying to not move." Dkt. 16-1 (Holte Dep. 135:8–20, 140:13). On defendants' motion for summary judgment, the court must accept Holte's testimony that he kept his hands on his thighs throughout the confrontation. This testimony contradicts Braatz's explanation for why Holte's hands were not visible to him. Whether Braatz could see Holte's hands is genuinely disputed, but at summary judgment the court accepts Holte's version of the events.[2]

---

[2] The parties also dispute whether Braatz warned Holte that Braatz would shoot if Holte did not show his hands. Whether a warning is given may be a factor in the reasonableness analysis. *Tennessee v. Garner*, 471 U.S. 1, 11–12 (1985). But the court of appeals has held that an officer who shouted, "Halt, police," before firing on a fleeing suspect had given an adequate warning. *Ford v. Childers*, 855 F.2d 1271, 1276 (7th Cir. 1988). Braatz gave at least the *Ford*-type

Holte's situation is similar to that of the plaintiff in *Phillips v. Community Insurance Corp.*, 678 F.3d 513 (7th Cir. 2012). In *Phillips*, the plaintiff was lying in the driver's seat of her stopped car with the door open, surrounded by police officers. She refused repeated commands to exit her car, after which the officers shot her several times with "less-lethal" rounds from an SL6 baton launcher, causing severe injuries. The court of appeals concluded that she did not pose an immediate threat because "there was no escalation or change in circumstances that called for immediate action on the officers' part." *Id.* at 525. Under Holte's version of events, like the plaintiff in *Phillips*, Holte did not pose an immediate threat at the time he was shot. According to Holte, he was sitting down, unmoving, with his hands placed on his thighs and close to his knees.

As for the third factor, whether Holte was actively resisting arrest or attempting to flee, it is undisputed that Holte was doing neither at the time that Braatz shot Holte. Holte was refusing the officers' orders to show his hands, but "leaving oneself exposed to repeated police fire [by remaining still while refusing to obey officers' commands] does not represent 'active resistance.'" *Phillips*, 678 F.3d at 525. Rather, it represents merely "passive noncompliance of a different nature than the struggling that . . . warrants escalation of force." *Id.*

In sum, although Holte had committed a dangerous crime by recklessly driving through the city while fleeing the officers, and although he refused the officer's orders, he was not actively resisting. A reasonable jury could find that he did not pose an immediate threat at the time that Braatz shot him, and thus find that Braatz's use of deadly force was unreasonable.

---

warning, so whether Braatz expressly said that he would shoot is probably immaterial. And at this point, the court would have to construe the dispute in Holte's favor.

To support the contrary conclusion that Braatz's use of force was objectively reasonable, defendants rely on three appellate decisions from outside the Seventh Circuit. The three cases are distinguishable because they involved officers who were required to make split-second decisions in response to rapidly changing circumstances not present here.

Two of the cases involve suspects who were shot while moving their hands toward their backs while being held at gunpoint. *Davis v. Edwards* involved an officer who fired on a suspect who had been waving a pistol around threateningly before the officer arrived. 779 F. App'x 691 (11th Cir. 2019). The officer was holding the suspect at gunpoint, and the suspect's hands were in the air. The officer ordered the suspect to keep his hands in the air; instead, he "moved his hands toward his back waistband," when the officer shot him. *Id.* at 693. The court noted that the officer "was in a precarious position that necessitated an immediate decision" and concluded that his use of force was reasonable. *Id.* at 696. *Anderson v. Russell* likewise involved a suspect who was shot when he lowered his hands toward his back pocket while being held at gunpoint. 247 F.3d 125, 128 (4th Cir. 2001).

The third case, *McLenagan v. Karnes*, involved two arrestees being held in a break room at a toll plaza after being arrested at a sobriety checkpoint. 27 F.3d 1002 (4th Cir. 1994). One of the arrestees ran from the room and seized a stray revolver, after which a sheriff's deputy ran from the room into a hallway shouting, "The man has got a gun!" *Id.* at 1005. The deputy ran by a police officer, still shouting that the arrestee had a gun. The other arrestee (who was unarmed) then ran into the hallway, "also trying to flee the perceived danger." *Id.* The police officer "immediately drew his gun, wheeled and saw [the unarmed arrestee] almost upon him." *Id.* The officer shot the arrestee once before realizing that he was unarmed. *Id.* The court held

9

that the use of force was reasonable, stressing that the officer didn't have time to verify whether the arrestee was armed because the arrestee, "in full flight, was virtually upon him." *Id.* at 1007.

These cases involved suspects who were moving their hands or rushing directly at an officer at the time they were shot, requiring the officers to make split-second decisions. If it were undisputed that Holte's hands were concealed when Braatz shot him, these cases would be more instructive. But at summary judgment, the court must accept as true Holte's testimony that his hands were still and that he was frozen in place, so these cases simply aren't on point. Defendants contend that immediate action was required because Holte's hands were on his lap, an area that "is near his waistband, pockets, and sweatshirt (areas where firearms are commonly kept and readily accessible)." Dkt. 35, at 2. But even if Holte had a weapon concealed in one of these places, he would still have needed to move his hand to where the weapon was concealed before he could have drawn it. Under Holte's version, he didn't pose the kind of immediate threat at issue in the cited cases.

Holte has adduced evidence from which a jury could reasonably find that Braatz's use of force violated Holte's Fourth Amendment rights, so defendants aren't entitled to summary judgment on the merits of Holte's claim.

### 2. Qualified immunity

Defendants contend that even if Braatz violated Holte's rights, defendants are entitled to qualified immunity because those rights were not clearly established at the time of the shooting. A right is "clearly established" if it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (internal quotation marks removed). This standard doesn't require "a case directly

on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

"[T]he law is clearly established that police officers cannot use significant force on suspects who are only passively resisting arrest." *Miller v. Gonzalez*, 761 F.3d 822, 829 (7th Cir. 2014) (internal quotation marks omitted); *see also Phillips*, 678 F.3d at 529 ("[I]t was clearly established [when officers fired on suspect with nonlethal rounds] that officers could not use such a significant level of force on a nonresisting or passively resisting individual."). Defendants contend that these cases are not on point because the officers in *Phillips* had no reason to believe that the suspect was armed or dangerous and because the suspect in *Miller* was "lying motionless and spread-eagled on the ground," 761 F.3d at 829. But defendants base their qualified immunity argument on disputed facts. Holte says that he was frozen still, with his hands unmoving on his thighs, near his knees. If a jury believed Holte's testimony, it could find that he was engaging in passive resistance rather than posing the type of immediate threat that can justify the use of deadly force.

A passively resisting suspect's right to be free of deadly force was clearly established at the time that Braatz shot Holte, so defendants aren't entitled to qualified immunity.

## C. Location of trial

Defendants ask the court to hold the trial in Eau Claire. Dkt. 36. Holte opposes the request. Dkt. 38.

Defendants raise their motion under 28 U.S.C. § 1404(c), which allows a district court to "order any civil action to be tried at any place within the division in which it is pending." This case was filed in Madison, not Eau Claire, which is in a separate division of this district. So § 1404(c) does not provide a basis for holding the trial in Eau Claire. Nevertheless, the

court would hold the trial in Eau Claire if both sides agreed to it, or if one side made a compelling case for it.

The court will consider defendants' request using the § 1404(c) framework. No appellate court has addressed the matter in a published opinion, but courts tend to apply the factors relevant to motions to change venue under 28 U.S.C. § 1404(a) when considering motions under § 1404(c). *See, e.g.*, *Llizo v. City of Topeka, Kan.*, 844 F. Supp. 2d 1212, 1214 (D. Kan. 2012); *Four Corners Nephrology Assocs., P.C. v. Mercy Med. Ctr. of Durango*, 464 F. Supp. 2d 1095, 1098 (D. Colo. 2006); *see also Grossman v. Smart*, No. 95-1178, 1995 WL 767893, at *1 (7th Cir. Dec. 29, 1995) ("We look to the transfer requirements of 28 U.S.C. § 1404(a) in assessing the court's exercise of discretion [on a motion under § 1404(c)]."). Section 1404(a) directs the court to consider two factors regarding a transfer of venue: (1) whether transfer will serve the convenience of the parties and witnesses; and (2) whether transfer will promote the interest of justice. The moving party has the burden of showing that transfer is appropriate. *Coffey v. Van Dorn Iron Works*, 796 F.2d 217, 219–20 (7th Cir. 1986).

As for the convenience of the parties and witnesses, defendants' main point is that a trial in Eau Claire will be more convenient for Braatz and other likely witnesses, most of whom live in that area. But Holte's attorney says in a declaration that Holte and his girlfriend, Sadie Gray, will both testify at trial and that they plan to move to Madison or Milwaukee before trial. Dkt. 39, ¶¶ 2–4. Holte's attorney says that Holte and Gray are "very poor" and that holding the trial in Eau Claire would require them to rent lodging during the trial. *Id.*, ¶ 4. So the convenience of an Eau Claire trial to Braatz and other witnesses would be offset by inconvenience to Holte and Gray. Additionally, courts typically show deference to a plaintiff's choice of forum, particularly when that forum is the plaintiff's home forum. *See Sinochem Int'l*

12

*Co. Ltd. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430 (2007) ("A defendant . . . ordinarily bears a heavy burden in opposing the plaintiff's chosen forum. When the plaintiff's choice is not its home forum, however, the presumption in the plaintiff's favor applies with less force." (internal quotation marks omitted)). It makes sense under this principle for the court to show some deference to Holte's preference for a trial in Madison.

As for the interest of justice, defendants make two points. First, they contend that jurors in the Eau Claire area should decide this case because the events at issue occurred in Eau Claire. This argument would have more force in a motion to transfer from one judicial district to another. *See, e.g.*, *Harwell-Payne v. Cudahy Place*, No. 20-cv-804, 2021 WL 964781, at *3 (W.D. Wis. Mar. 15, 2021) ("The core dispute in this case is between two residents of the Eastern District, making that district closer to the action underlying the case and weighing in favor of transfer." (internal quotation marks omitted)). But as this court has noted in the criminal context, "[t]here is no requirement . . . that a defendant be tried only by jurors living within a close radius of the location of the crime." *United States v. Raineri*, 521 F. Supp. 30, 32 (W.D. Wis. 1980). Defendants identify no special circumstances that require Eau Claire jurors to hear this case.

Second, defendants say that they anticipate filing a motion to have the jury visit the site of the shooting, which would be more convenient if the trial were held in Eau Claire. They contend that a site visit would allow the jury to better evaluate witness testimony about the shooting by giving the jury a better understanding of the terrain. But the parties' proposed facts, which included several photographs of the site, allowed the court to adequately understand the layout of the site. Nothing in defendants' motion suggests that a site visit by the jury would be necessary, and the court would be disinclined to allow it.

Defendants haven't shown that holding the trial in Eau Claire is warranted, so the court will deny the motion.

ORDER

IT IS ORDERED that:

1. Plaintiff Tyler Holte is ordered to show cause by July 1, 2021, why defendant City of Eau Claire is not entitled to summary judgment on Holte's claim against it under Wis. Stat. § 895.46. The City of Eau Claire may have until July 8 to respond.

2. Defendants City of Eau Claire and Hunter Braatz's motion for summary judgment, Dkt. 9, is DENIED.

3. Defendants' motion to hold trial in Eau Claire, Dkt. 36, is DENIED.

Entered June 21, 2021.

THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge